STATE OF VERMONT
SUPERIOR COURT — ENVIRONMENTAL DIVISION

| | | |
|---|---|---|
| In re Twin Pines Housing Trust & Dismas of Vermont Conditional Use | { { { { | Docket No. 95-7-11 Vtec |
| In re Twin Pines Housing Trust & Dismas of Vermont Site Plan | { { | Docket No. 96-7-11 Vtec |

## Decision on the Merits

On appeal are two decisions by the Town of Hartford (the Town) relating to Dismas of Vermont, Inc. (Dismas) and Twin Pines Housing Trust (Twin Pines)' proposed plan to convert an existing 3,800-square-foot building at 1673 Maple Street in Hartford Village, Vermont from use as a multi-family dwelling to use in part as an office and in part as a lodging house (the Project):  the Planning Commission (the Commission) decision granting site development plan approval, and the Zoning Board of Adjustment (the ZBA) decision granting conditional use approval.    The Court considered these two matters in a coordinated fashion pursuant to Vermont Rules of Environmental Court Proceedings (V.R.E.C.P.) Rule 2(b).

The Court conducted a site visit on June 13, 2012  to the  subject property 1673 Maple Street in Hartford Village, Vermont, immediately followed by a two-day merits hearing on June 13 and 14, 2012 at the Civil Division, Windsor Unit courthouse.  Appearing at the site visit and trial were Appellants Lani and Kathleen Janisse, Praise Chapel, Inc., and Potters House School & Daycare (collectively, Appellants) and their attorney Stephen P. Girdwood, Esq.  Also present was Dismas, represented by C. Daniel Hershenson, Esq., and Twin Pines, through its representative Jenny Gibson.  Although the Town appeared and participated in the pre-trial phases of these matters, neither the Town nor its attorney William F. Ellis, Esq. attended the site visit or participated in the merits hearing.  Interested person Nancy A.G. Vogele was present for the site visit and merits hearing but did not actively participate.

In the appeal of the conditional use approval, Docket No. 95-7-11 Vtec, (the CU Appeal) Appellants raise 9 questions for the Court's review.  In the appeal of the site development plan approval, Docket No. 96-7-11 Vtec, (the SP Appeal) Appellants raise 6 questions for the Court's review.  During the pre-trail stage of these matters, Dismas filed a motion for summary

judgment in the CU Appeal. In an April 26, 2012 Decision the Court granted Judgment in Dismas' favor on Questions 1 and 3 in the CU Appeal. Therefore, Questions 2 and 4–9 remained at issue for the merits hearing. All 6 of Appellants' Questions in the SP Appeal remained before the Court.

At the start of the merits hearing, the parties stipulated to the admission of several exhibits. One exhibit, Appellee's Exhibit H, is a boundary line agreement between Twin Pines and Michael and Janet O'Hora. Based upon Exhibit H, Appellants withdrew Question 1 in the SP Appeal and Question 9 in the CU Appeal.

Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact and Conclusions of Law.

## Findings of Fact

**THE PROJECT GENERALLY**

1. Dismas is a non-profit organization that provides transitional housing to formerly incarcerated Vermonters.

2. Dismas has entered into a contract with Twin Pines to purchase a 3,800-square-foot 1900s Victorian home at 1673 Maple Street in Hartford Village, Vermont (the House).

3. The House is located on a 0.258 acre lot on the north side of Maple Street in the Village Residential-Commercial (VR-C) zoning district in the Town of Hartford.

4. In the spring and summer of 2011, Dismas and Twin Pines sought conditional use approval and site development plan approval to authorize the conversion of the House from use as a multi-family dwelling to use in part as an office and in part as a lodging house.

5. On June 8, 2011, the ZBA heard evidence on the conditional use application and, on June 13, 2011, issued a decision granting conditional use approval to Dismas and Twin Pines. Appellants subsequently appealed that determination in Docket No. 95-7-11 Vtec.[1]

6. On June 13, 2011, the Commission heard evidence on the site development plan application and, on June 15, 2012, issued a decision granting site development plan approval to Dismas and Twin Pines. Appellants subsequently appealed that determination in Docket No. 96-7-11 Vtec.

---

[1] In our April 26, 2012 ruling on Dismas' motion for summary judgment, we erroneously identified the Town of Hartford Planning Commission as the municipal panel responsible for rendering the June 13, 2011 grant of conditional use approval to Dismas and Twin Pines. That error did not impact our substantive analysis of the issues raised in the motion for summary judgment.

7.     Dismas proposes to house 10 residents, including 2 college students or volunteers, in the House while also maintaining 2 trained adult staff on-site during the day.  A cook will prepare meals and eat with residents.

8.     Dismas will offer priority placement to former prisoners returning to the Town, but will not offer housing to sex offenders.

9.     Residents will be asked to commit to a minimum 3-month stay, although Dismas anticipates many will choose to stay for 6 to 8 months, and others for 12.  Residents who are college students will generally stay for an academic year although some will only stay for the summer months.

10.     Residents will be expected to prepare breakfasts and lunches daily, cook meals on weekends, help with weekly chores assigned to them, and help volunteers who cook dinner for them on week nights.  Dismas' program model is that "Dismas Is Family."  Residents live in a community where every voice is heard, work or go to school, participate in communal evening meals, and attend weekly housing meetings where there is consensus decision-making.

11.     Dinnertime is the centerpiece of the Dismas day when residents, college students, and community volunteers join together as "family" around a communal dining table.

**THE HOUSE**

12.     The House is approximately 140 years old and is proposed for substantial renovation and improvement.  The House was originally a single-family home.  In the 1980's and 1990's its use was changed to its existing multi-family use with 3 apartment units.  The Project will return the House to a single-family design.

13.     The House is currently configured with 3 apartments and has a total of 8 bedrooms occupied by 12 people, 3 of whom are children.  Following renovations, the House will be configured as a single-family home with 9 bedrooms and 2 small offices.  It will be occupied by 10 people (8 residents having single bedrooms and 2 students sharing the final, large bedroom).

14.     Although there was conflicting evidence regarding architectural drawings of the dining room configuration and possible table and chair setup, the Project architect was instructed by Dismas to produce drawings providing dining space for 8 residents, 2 college students, 2 staff and occasional visitors.  This instruction resulted in a design for 1 dining table with 6 chairs.

15.     There will be little change to the exterior of the House.

3

**THE SITE**

16. The 0.258 acre site on which the Project is proposed is relatively flat overall.

17. Under the existing site conditions, stormwater flows east and west to neighboring properties and south onto Maple Street.

18. The Project proposal includes new site grading directing stormwater to the back of the property and away from the road and neighboring properties. The grading will direct stormwater to flow from the driveway, parking areas, and roof to the north to a retention basin designed with an infiltration rate calculated to handle storm events ranging from 2 years to 100 years.

19. Snow removal within the driveway and on-site parking will include plowing into the water retention area. It is possible that snow during the winter months could block or alter stormwater flow direction. If this occurs the snow would need to be removed to allow stormwater to flow as designed. Additionally, if too much snow accumulates for the water retention area to contain, the excess snow will need to be transported off-site.

20. The site plan, as originally designed and proposed to the Town, included an on-site parking space close to the driveway's intersection with Maple Street. In Dismas and Twin Pine's current Project proposal, this parking space has been relocated toward the rear, or north, end of the lot. The area of the eliminated parking space will be grass and include a row of 12 arborvitae. This area will serve as a buffer to the eastern bordering apartment building that has an address of 1661 Maple Street.

21. Dismas testified to its willingness to increase the number of arborvitae and extend the screening along the eastern boundary the Project site shares with 1661 and 1615 Maple Street.

22. The proposed impervious area of the Project is less than one acre, and therefore, the Project does not require a State Stormwater Permit.

**THE DRIVEWAY AND PARKING**

23. The existing driveway will be reconstructed as part of the Project improvements.

24. The proposed driveway and parking spaces are designed and configured with a "Y" turn-around area at the rear, or north, end of the driveway. This will allow vehicles which enter the Project to perform a three-point turn in order to drive out onto Maple Street, avoiding the need to back out into traffic.

4

25.    The Town of Hartford, VT Chapter 260 Zoning Regulations (Regulations) require one parking space for each resident and one parking space for every 300 square feet of office space. A total of 10 residents are proposed for the Project and the proposed office space totals 154 square feet.

26.    Visitors and a cook may attempt to park on-site.

27.    House rules will prohibit the 8 furloughed residents from having their own vehicle at the Project site.

28.    The Project is designed with 6 on-site parking spaces, 1 of which will be designated as handicapped.  5 other spaces, for a total of 11 spaces, are proposed off-site at a municipal lot.

29.    The municipal lot is located on the south side of Maple Street, opposite and slightly to the southeast of the Project site.  This municipal lot has between 15 and 20 parking spaces. Parking within the municipal lot includes approximately 150 to 180 feet of parking perpendicular to Maple Street and a few parallel spaces at the eastern end of the lot.  All of these spaces are within 1,000 feet of the Project site.

30.    The Town maintains the municipal parking lot.  The regularity of the Town's maintenance is uncertain.  Overnight parking in this off-site lot is not allowed from December 1 through May 1.

31.    Project off-site parking within the municipal lot requires pedestrians to cross over Maple Street.

32.    A painted cross-walk is located immediately in front of the Project allowing for pedestrian crossings of Maple Street.

33.    No sidewalk exists on the south side of Maple Street.  There is a shoulder on the south side of Maple Street varying in width from 4 to 4.5 feet, and the shoulder narrows as one approaches the crosswalk from the east.  It is approximately 90 to 100 feet from the crosswalk to the parking area.

34.    Parking in the municipal lot will not physically block or impede traffic on Route 14 (Maple Street).

35.     In addition to the municipal lot, there is other off-site parking east of the Project site in Hartford Village's commercial area.  These spaces include 9 on-street public parking spaces on Maple Street within 800 feet of the Project site.  The sidewalk on the north side of Maple Street is accessible from these 9 on-street parking spaces.

5

36. Decorative street lighting exists on the north side of Maple Street near the Project site. It is uncertain whether street lighting exists on the south side of Maple Street in the vicinity of the municipal lot.

37. The existing width of the Project's driveway at its intersection with the sidewalk is 18 feet. The driveway width will be unchanged by the Project.

38. Neighboring driveways have varying widths as follows. The O'Horas' driveway to the west of the Project is 14 feet wide. The Janisses' driveway to the east of the Project is 26.5 feet wide; however, it is shared between 2 properties. The school and church share a driveway further to the east, which is 18.5 feet wide; the library has a driveway which is 19 feet 8 inches wide; and the apartment building to the east of the Project has a driveway that is 22 feet wide. Thus, with the exception of one shared driveway, all area driveways are less than 26 feet in width.

39. Pursuant to the Town of Hartford Highway Specifications, Figure 4, the minimum width for a driveway intersection with a highway is 12 feet wide. The Vermont Agency of Transportation (VTrans) Standard B71 regulates the safety of driveways and also requires residential driveways to be a minimum of 12 feet wide.

40. The typical passenger vehicle is 7 to 8 feet wide.

**TRAFFIC**

41. Truck deliveries to the Project site may include FedEx and fuel oil. Currently, delivery trucks drive on-site, off-load, and back out onto Maple Street. Sometimes delivery trucks temporarily park along Maple Street parallel to the Project site. Delivery truck activity will not be altered as a result of the Project.

42. Household garbage from the Project will be collected in one 96-gallon plastic toter which, will be wheeled out to the curb of Maple Street at collection time, typically one day per week. If the Project generates more garbage than expected, a second toter will be used. This practice will eliminate or reduce the need for a garbage truck to enter the Project site.

43. VTrans' policies or recommendations require a formal traffic study for a new development when the project will generate approximately 75 additional trips per peak hour.

44. According to the Institute of Engineering Trip Generation Report, 8th Edition, an apartment with 9 occupants generates 0.4 P.M. peak hour trips per person. The Institute of Engineering Trip Generation Report does not provide analysis of "lodging facilities," and thus,

6

for the purposes of traffic flow calculation, we understand an apartment with 9 occupants to be the closest analogous use to the Project use. Applying the Report's calculation, the Project will conservatively generate a total of 4 to 5 trips per peak hour.

45. Resource Systems Group performed a traffic count, assessing the current pre-Project conditions, at the Project driveway in May 2012 during the 7 A.M. to 9 A.M. weekday peak hours and 4 P.M. to 6 P.M. weekday peak hours. This traffic count identified a total of 6 to 7 trips per peak hour occurring currently.

46. The May 2012 Resource Systems Group traffic count recorded 6.2 percent of the P.M. peak trips on Maple Street to be trucks and the remaining trips to be non-trucks. This is an ordinary percentage of truck traffic as compared to non-truck traffic.

47. According to VTrans, the average daily traffic on this section of Route 14 (Maple Street) is 4,800 trips per day. The design hour for a roadway, or the maximum capacity that a roadway can safely accommodate in one hour, is 10 to 12 percent of the average daily traffic. Thus, for Route 14 the design hour includes 576 trips.

48. The posted speed limit on this section of Route 14 (Maple Street) is 30 miles per hour (MPH). No speed studies were completed for the Project.

49. The required minimum adequate site distances for a 30 MPH roadway is 200 feet.

50. The existing sight distance at the Project driveway to the east far exceeds 200 feet and the existing sight distance to the west is 400 to 410 feet.

51. 16 vehicle accidents occurred from 2005 to 2010 within a half mile of the Project site, and none involved the Project site or its driveway. The reported causes of these accidents were inattention and failure to yield the right-of-way. There was no indication that accidents were caused by road conditions.

**THE AREA**

52. In the VR-C district a lodging house is a permitted conditional use.

53. The area around the Project site includes a mix of uses: single family homes, apartments, a bed and breakfast, restaurants and catering businesses, a church, an outpatient clinic for the treatment of opiate addiction, a gas station and convenience store, a United States Post Office, and a fuel oil business.

54. Other properties in the vicinity of the Project site are an Elks Lodge, the Cornerstone Community Food Bank, and a library, which holds movie nights and community dinners.

7

55. Town residents and visitors walk through the area of the Project and the neighboring school playground.

**APPELLANTS**

56. Lani and Kathleen Janisse live at 1625 Maple Street, which is located three properties to the east of the Project site.

57. The Janisses moved to Hartford Village in 1981 and purchased their residence on Maple Street in 1985.

58. The Janisses also own a four-unit apartment house with a street address of 1661 Maple Street that is located adjacent to the Project site on its east. This apartment building is 18 to 24 inches from the property boundary it shares with the Project site.

59. The Janisses also own a two-unit apartment house with a street address of 1637 Maple Street that is located adjacent to 1661 Maple Street on its east. There are presently 7 occupants of this property, including young children.

60. The Janisses founded Praise Chapel, Inc. (the Chapel) and Potters House School and Daycare (the School) all located at 1615 Maple Street, which is east-northeast of the Project site. Mr. Janisse is the Pastor of the Chapel and Principal of the School. Mrs. Janisse is the Assistant Pastor of the Chapel.

61. The School uses the back or north portion of 1661 Maple Street for some of its outdoor activities. For instance, the playground is in this area and is approximately 60 to 70 feet away from the Project site. The Project site and the House can be seen from the School and the Chapel.

62. The School has 40 students and 8 staff members. Approximately 150 people attend weekend services at the Chapel.

63. The Janisses' Bed and Breakfast has guests who are transients.

## Conclusions of Law

Appellants have appealed the ZBA's June 13, 2011 decision granting conditional use approval and the Commission's June 15, 2011 decision granting site development plan approval to Dismas and Twin Pines for the conversion of an existing 3,800-square-foot building at 1673 Maple Street in Hartford Village, Vermont from use as a multi-family dwelling to use in part as an office and in part as a lodging house. In our April 26, 2012 decision, we granted summary judgment to Dismas and Twin Pines on CU Appeal Questions 1 and 3, determining that the

undisputed material facts showed that Dismas' proposed non-office use fits within the definition of "lodging house" in Regulations § 260-59, a type of conditional use within the VR-C zoning district. In our April 26, 2012 decision, we also determined that the regulation of land use based solely on the identity of the owner of the property is not within the authority granted to a municipality under 24 V.S.A., Chapter 117. Vt. Baptist Convention v. Burlington Zoning Bd. 159 Vt. 28, 30–31 (1992) ("A distinction based upon the identity of the owner rather than the public health, safety, morals, or general welfare would be invalid."). No evidence admitted during the merits hearing causes us to alter these determinations.

Within the CU Appeal, Questions 2 and 4–8 in Appellants' Statement of Questions (SOQ) address specific requirements in the Regulations which must be satisfied for Dismas and Twin Pines to obtain conditional use approval of the Project. Similarly, within the SP Appeal, Questions 2–6 in Appellants' SOQ address specific requirements in the Regulations which must be satisfied for the parties to obtain site development plan approval of the Project. No party disputes that these requirements must be met in order for the applicants to receive the requested approvals.

## I.    The Project Does Not Require a Variance

Appellants' CU Appeal Question 2 asks whether the Project requires a variance. It is not readily apparent to the Court from what requirement in the Regulations Appellants assert that Dismas must seek a variance. There was no testimony or evidence offered by Appellants that expressly or directly addressed this issue.

We are left to infer from Dismas' Statement of Undisputed Material Facts filed in support of Dismas' Motion for Summary Judgment that Appellants' argument is that because the Project does not qualify as a "lodging house" or other permitted use, it therefore requires a variance. Because we concluded in our April 26, 2012 decision that the Project fits within the definition of "lodging house" in Regulations § 260-59, and because no testimony or evidence received during the merits hearing causes us to alter this determination, we conclude that a variance is not required for the Project.

## II.    The Project Will Not Result in an Undue Adverse Effect on the Character of the Area

Appellants' CU Appeal Questions 4 and 5 ask whether the Project meets the criterion for conditional use approval found in Regulations § 260-16.A(2). This criterion requires that an

applicant show that a proposed conditional use does "not result in an undue adverse effect . . . such that an impact cannot be reasonably mitigated" on "[t]he character of the area, as defined by the objectives of the zoning district within which the project is located and specifically stated policies and standards of the municipal plan." Regulations § 260-16.A. In CU Appeal Questions 4 and 5, Appellants specifically ask (1) whether the Project will adversely impact the character of the area given its proximity to the library, church, school, daycare, bed and breakfast, and apartment building in Hartford Village and (2) whether the Project will adversely impact the character of the area given the goals stated in the municipal plan to provide for the safety of children and elderly in Hartford Village.

Regulations § 260-16A(2) defines "character of the area" as follows:

> [B]y the objectives of the zoning district within which the project is located and specifically stated policies and standards of the municipal plan, including, but not limited to:
> a.     Scenic or natural beauty, historic sites, or rare and irreplaceable natural areas.
> b.     Compatibility with scale and design of structures existing in that area.

The objective of the VR-C Zoning District is "[t]o provide an area of mixed residential-commercial uses in or near village centers where commercial facilities generate little traffic and are compatible with a village residential environment." The area around the Project site presently includes a mix of uses: single family homes, apartments, a bed and breakfast, restaurants and catering businesses, a church, an outpatient clinic for the treatment of opiate addiction, a gas station and convenience store, a United States Post Office, a fuel oil business, an Elks Lodge, the Cornerstone Community Food Bank, and a library.

Nothing about the lodging house or its proximity to the surrounding mixed uses results in an adverse impact to the character of the area as defined by the objective of the VR-C Zoning District. The Project is a residential use and will return the House to its original single-family-home physical layout with the number of residents remaining similar to the number using the property currently. There will also be little change to the exterior of the House. The Project will generate little traffic and is compatible with Hartford Village's residential environment.

Further, the Project does not conflict with the two specific policies and standards that Regulations § 260-16.A(2) identifies. Appellants themselves do not claim that the Project will adversely impact the scenic or natural beauty of the area, historic sites, or rare and irreplaceable

natural areas. Additionally, whether the Project is compatible with the scale and design of structures existing in the surrounding area is not at issue as Applicants have proposed little exterior change.

Neither the Court nor Appellants have identified any other specific policies or standards in the June 5, 2007 Town of Hartford Master Plan (Town Plan) that would relate to the character of the area at issue here. In their CU Appeal Question 4, Appellants assert that the Project will adversely impact the character of the area given the goals stated in the Town Plan to provide for the safety of children and elderly in Hartford Village. Although Appellants do not identify where in the Town Plan this alleged specifically stated policy or standard can be found, it appears they must be referencing Chapter II, Land Use, Hartford Village which recognizes the Hartford Village Community Association (HVCA) and informs us that the HVCA was originally formed to address issues of safety for the children and the elderly in Hartford Village.

While this Court has not often analyzed what comprises a specifically stated policy or standard in a municipal plan in the context of a municipal permitting decision, considerable jurisprudence exists establishing a framework for this analysis under Act 250 Criterion 10. We have previously looked to the Criterion 10 framework where a municipal regulation required compliance with the "intent of the Town Plan," In re Blakeman Site Plan (Appeal of Blakeman), No. 274-11-06 Vtec, slip op. at 7 (Vt. Envtl. Ct. July 30, 2007) (Wright, J.), and where a regulation required "conformance with the Town Plan." In re Quesnel Waiver Appeal (After Remand), No. 150-10-110 Vtec., slip op. at 6–7 (Vt. Super. Ct. Envtl. Div. July 2, 2012) (Walsh, J.). We find the Act 250 analysis equally applicable in this matter.

Under Criterion 10, there are two steps that this Court must take to identify the specific policy in a town plan with which a project must comply. Our first determination is to identify relevant language that is mandatory rather than aspirational. Re: J. Flynn Estate and Keystone Dev. Corp., #4C0790-2-EB, Findings of Fact, Concl. of Law, and Order, at 27–28 (Vt. Envtl. Bd. May 4, 2004). Mandatory language is depicted by words such as "shall be protected" Id. at 28 (citing Re: Sw. Vt. Health Care Corp., #8B0537-EB, Findings of Fact, Concl. of Law, and Order, at 54 (Vt. Envtl. Bd. Feb. 22, 2001)). Aspirational language such as "encourage" or "promote" merely state a town's desires, and, without more specificity, such language cannot be read as restricting specific activities. Id. at 27. Thus, aspirations alone cannot be the basis for a permit denial.

11

If we find mandatory language within a town plan, we move on to the next step of the analysis. In this second step, we must determine whether the relevant, mandatory provisions are truly specific, or, conversely, whether they are "general in nature or ambiguous." John J. Flynn Estate and Keystone Dev. Corp., #4C0790-2-EB, Findings of Fact, Concl. of Law, and Order, at 27–28. If the identified provisions are specific, they "evince a specific policy" and are applied to the project. Id. at 28. A town plan provision is considered to "evince a specific policy" if it "(a) pertains to the area or district in which the project is located; (b) is intended to guide or proscribe conduct or land use within [that area or district]; and (c) is sufficiently clear to guide the conduct of an average person, using common sense and understanding." Id.; see also In re Times and Seasons, LLC and Hubert K. Benoit, #3W0839-2-EB, Findings of Fact, Concl. of Law, and Order (Altered), at 59–60 (Vt. Envtl. Bd. Nov. 4, 2005).

We conclude that Regulations § 260-16.A is not, and does not provide, a "specifically stated polic[y] or standard[]" relating to children and the elderly. There is no mandatory language within the Town Plan, Chapter II, Land Use, Hartford Village. Rather, this section merely discusses the social fabric and history of the Village. Thus, Appellants are mistaken that the Project is restricted or prohibited by the Town Plan.

While we conclude that the Town Plan lacks pertinent specifically stated policies and standards, we note that the Town Plan does contain pertinent non-binding recommendations which are summarized in Chapter XII, Implementation Program. While these recommendations do not legally constrain the Project, we nonetheless observe that the Project conforms to them. With respect to historic and cultural resources, the Town Plan encourages public off-site, off-street parking in Hartford Village center to ensure that the landscaped areas around historic structures are conserved to the greatest extent possible. The Project's use of off-site parking allows for additional green space and planting of arborvitae which will enhance the Project's appearance and help to buffer impacts on the neighboring properties. Second, mixed-use development is encouraged in the village center. The Project is a lodging house for transitional housing which is not offered elsewhere in Hartford, and therefore, adds to the mixed-use aspect of the village center. Third, with respect to housing, support is to be given for the development of housing for special needs populations. Additionally, renovation and re-use of existing buildings to meet various housing needs is encouraged. The Project is aligned with both of these recommendations. Fourth, with respect to roads and transportation, use of the

12

Town's Highway Specifications is encouraged to implement access management standards along local highways. The Project's driveway complies with § 75-40 of the Highway Specifications. The driveway intersects with Maple Street at approximately 90 degrees (Highway Specifications § 75-40(C)); the driveway is paved (Highway Specifications § 75-40(G)); and the site, including the driveway and parking area will drain away from Maple Street (Highway Specifications § 75-40(E)). Fifth, with respect to parking, flexibility in the Town's Regulations is encouraged to utilize public parking, shared parking opportunities, and offset parking space requirements. As discussed below, the Project requires 11 parking spaces, 5 of which are proposed as off-site at the municipal lot on the south side of Maple Street.

Based upon the above, we conclude that the Project will not result in an undue adverse effect on the character of the surrounding area of mixed residential-commercial uses, as defined by the objectives of the zoning district within which the Project is located and specifically stated policies and standards of the Town Plan.

### III. Parking and Traffic

#### a. Capacity of Roads and Highways

CU Appeal Question 6 asks whether the Project meets the criterion for conditional use approval found in Regulations § 260-16.A(3). This criterion requires that an applicant show that a proposed conditional use does "not result in an undue adverse effect . . . such that an impact cannot be reasonably mitigated" on "[t]he capacity of roads and highways in the vicinity to safely accommodate expected traffic flows." Regulations § 260-16.A.

According to the VTrans data, the average daily traffic on this section of Route 14 (Maple Street) is 4,800 trips per day. The design hour for a roadway, or the maximum capacity that a roadway can safely accommodate in one hour, is 10 to 12 percent of the average daily traffic. For Route 14 this is 576 trips. According to the Institute of Engineering Trip Generation Report, 8th Edition, an apartment with 9 occupants generates P.M. peak trips of 0.4 trips per person. The Institute of Engineering Trip Generation Report does not provide analysis of "lodging facilities," and thus, for the purposes of traffic flow calculation, we understand an apartment with 9 occupants to be the closest analogous use to the Project use. Applying the Report's calculation, the Project will conservatively generate a total of 4 to 5 trips per peak hour.

Resource Systems Group performed a traffic count, assessing the current pre-Project conditions, at the Project driveway in May 2012 during the 7 A.M. to 9 A.M. weekday peak

hours and 4 P.M. to 6 P.M. weekday peak hours. This traffic count identified a total of 6 to 7 peak hour trips occurring currently at the Project site. As Maple Street can safely accommodate 576 trips per hour, we conclude that adding 5 additional trips will not result in an undue adverse effect on the capacity of roads and highways in the vicinity of the Project.

### b. Traffic Impact Study

CU Appeal Question 7 asks whether Dismas and Twin Pines can satisfy Regulations § 260-16.A(3) without a traffic impact study by a professional traffic engineer. SP Appeal Question 2 asks whether the Project complies with Regulations § 260-45.B with respect to the potential need for a professional traffic impact study.

As recited above, Regulation § 260-16.A(3) requires that an applicant show that a proposed conditional use does "not result in an undue adverse effect . . . such that an impact cannot be reasonably mitigated" on "[t]he capacity of roads and highways in the vicinity to safely accommodate expected traffic flows." It also states that "[i]n making this determination, the Board may require submission of a traffic impact study made by a professional traffic engineer." Regulations § 260-16.A. Additionally, Regulations § 260-45.B(3)(j) allows the Commission, and this Court on appeal, to require a traffic impact study to estimate the daily and peak hour traffic generated by the Project.

Dismas had two professional engineers testify to the VTrans threshold for requiring traffic studies as well as to the expected additional traffic that the Project will generate. VTrans' policies or recommendations require a formal traffic study for a new development when the project will generate approximately 75 additional trips per peak hour. As indicated above, the Project will add only 5 additional trips per peak hour. We find Dismas' testimony credible and sufficient for us to reach a determination about the safety of traffic flow associated with the Project—our conclusion above that the Project will not result in an undue adverse effect on the capacity of roads and highways in the vicinity of the Project. Thus, we conclude that a formal traffic impact study by a professional traffic engineer is not required.

### c. Driveway and Parking

CU Appeal Question 8 asks whether the Project meets the criterion for conditional use approval found in Regulations § 260-24.C. This criterion requires that an applicant show that any proposed off-street parking area and its associated access is in accordance with listed specifications. Appellants specifically ask whether Regulations § 260-24.C is satisfied with

14

respect to "access and parking where the driveway is too narrow, proposed parking spaces too few, and use of the vacant lot across the street unsafe and inadequate." (Revised Statement of Questions on Appeal 2, Docket No. 95-7-11 Vtec, filed Oct. 3, 2011.) Appellants take issue with the Project's driveway width, the proposal for 6 on-site parking spaces, and the 5 off-site parking spaces proposed to be located within the municipal lot on the south side of Maple Street.

Regulations § 260-24.C(4)(a) sets forth the required dimensional requirements for the access drive unless the requirements are varied by the Commission, or on appeal by this Court, based on evidence supplied by a qualified transportation professional specializing in the field of traffic analysis. For the Project's access drive with two-way traffic, a 26 foot width is required. See Regulations § 260-24.C(4)(a)[1].

The existing width of the Project's driveway at its intersection with the sidewalk is 18 feet. The driveway width will be unchanged by the Project. Neighboring driveways have varying widths as follows. The O'Horas' driveway to the west of the Project is 14 feet wide. The Janisses' driveway to the east of the Project is 26.5 feet; however, it is shared between 2 properties. The school and church share a driveway further to the east, which is 18.5 feet; the library has a driveway which is 19 feet 8 inches wide; and the apartment building to the east of the Project has a driveway that is 22 feet wide. Thus, with the exception of one shared driveway, all area driveways are less than 26 feet.

Pursuant to the Town of Hartford Highway Specifications, Figure 4, the minimum width for a driveway intersection with a highway is 12 feet wide. VTrans' Standard B71 regulates the safety of driveways, and also requires residential driveways to be a minimum of 12 feet wide. The typical passenger vehicle is 7 to 8 feet wide.

Dismas had two witnesses testify who are professional engineers with vast experience in the field of traffic analysis: Mr. John Bruno, P.E. and Mr. David Saladino. Mr. Bruno has provided professional engineering services for more than 40 years and performed hundreds of traffic studies. Mr. Saladino is a traffic engineer with 15 years of experience doing traffic studies for developers and opponents regarding small to large projects. Both of these witnesses testified as to the Project's driveway and opined that the 18 foot width was sufficient. In fact, Mr. Bruno testified that a 26–foot-wide driveway would be inappropriately oversized for the Project. Mr. Saladino furthered this point by testifying that good site design ensures that a

15

project is not over-designed and that the Project was well designed with an 18-foot-wide driveway. Accordingly, we conclude that the Project's 18 foot wide driveway satisfies Regulations § 260-24.C(4)(a)[1].

Appellants also take issue with the number of parking spaces proposed for the Project. Regulations § 260-24.C(9) requires 11 parking spaces for the Project. One parking space is required for each resident and one parking space for every 300 square feet of office space. A total of 10 residents are proposed for the Project (8 furloughed residents and 2 students), and the proposed office totals 154 square feet. House rules will prohibit the 8 furloughed residents from having their own vehicle at the Project site. Visitors and a cook may attempt to park on-site.

The Project is designed with 6 on-site parking spaces, 1 of which will be designated as handicapped. 5 other spaces, for a total of 11 spaces, are proposed off-site. These off-site parking spaces are to be located in a municipal lot on the south side of Maple Street, opposite and slightly to the southeast of the Project site. This municipal lot has between 15 and 20 parking spaces. Parking within the municipal lot includes approximately 150 to 180 feet of parking perpendicular to Maple Street and a few parallel spaces at the eastern end of the lot. Therefore, the existing municipal lot can accommodate present parking needs as well as the Project's parking needs. All of the spaces within the municipal lot are within 1,000 feet of the Project site in compliance with Regulations § 260-24.C(1)(b). Parking in the municipal lot will not physically block or impede traffic on Route 14 (Maple Street).

The Town maintains the municipal parking lot. While the regularity of the Town's maintenance is uncertain, overnight parking in this off-site lot is not allowed from December 1 through May 1 and, therefore, the Town is not obstructed from nightly removing snow during the winter season.

In addition to the municipal lot, there is other off-site parking east of the Project site in Hartford Village's commercial area. These spaces include 9 on-street public parking spaces on Maple Street within 800 feet of the Project site. The sidewalk on the north side of Maple Street is accessible from these 9 on-street parking spaces.

Project off-site parking within the municipal lot requires pedestrians to cross over Maple Street. A painted cross-walk is located immediately in front of the Project allowing for pedestrian crossings of Maple Street. No sidewalk exists on the south side of Maple Street.

16

There is, however, a shoulder on the south side of Maple Street varying in width from 4 to 4.5 feet, and the shoulder narrows as one walks from the parking area and approaches the crosswalk from the east. It is approximately 90 to 100 feet from the crosswalk heading east to the parking area. Dismas' witnesses testified that street lights, including Cobra lights on utility poles, exist on the south side of Maple Street in the vicinity of the municipal lot, and that decorative street lighting exists on the north side of Maple Street near the Project site. Appellants' witnesses provided conflicting testimony about whether there is street lighting on the south side of Maple Street in the area of the municipal lot.

In light of these characteristics of the Project—the cross-walk and the off-site municipal lot—we conclude that the passage between the parking lot and the Project is safe and complies with Regulations § 260-24.C(1)(a). We condition this conclusion on the existence of sufficient street lighting on the south side of Maple Street. If no lighting presently exists, then we require Dismas and Twin Pines to procure sufficient lighting.

Regulations § 260-24.C(7)(a) requires that parking is designed for ease in traffic flow and pedestrian safety. On-site parking is limited to 6 spaces which are configured to allow vehicles to enter, park, and then drive out onto Maple Street without endangering pedestrians. The proposed driveway and parking spaces are designed and configured with a "Y" turn-around area at the rear, or north, end of the driveway. This will allow vehicles which enter the Project to perform a three-point turn in order to drive out onto Maple Street, and thus, not have to back out into traffic. We therefore further conclude that the Project as designed allows vehicles to enter, easily park and turn around, and exit facing Maple Street at approximately a 90 degree angle in compliance with Regulations § 260-24.C(7)(b).

SP Appeal Question 3 asks whether the Project complies with Regulations § 260-45.C(1) and (4) by providing adequate safety for traffic and pedestrian circulation at the site and street network and proposed parking across the street. Based upon our above analysis, we conclude that the Project complies with Regulations § 260-45.C(1) and (4).

SP Appeal Question 4 asks whether the Project complies with Regulations § 260-45.C(2) by providing adequate on-site circulation, parking, and loading facilities. We have already concluded that the Project has adequate on-site circulation and parking facilities. With respect to loading facilities, truck deliveries to the Project site may include FedEx and fuel oil. Currently delivery trucks drive on-site, off-load, and back out onto Maple Street. Sometimes

17

delivery trucks temporarily park along Maple Street parallel to the Project site. Delivery truck activity will not be altered as a result of the Project. Household garbage from the Project will be collected in one plastic 96-gallon toter which, at collection time, typically one day per week, will be wheeled out to the curb of Maple Street. If the Project generates more garbage than expected, a second toter will be used. This practice will eliminate or reduce the need for a garbage truck to enter the Project site. Thus, we conclude that the Project complies with Regulations § 260-45.C(2).

Lastly, Appellants SP Appeal Question 2 asks whether the Project satisfies Regulations § 260-45.C(2) by providing adequate access for emergency vehicles. While neither Dismas nor Appellants provided testimony specific to emergency vehicle access, based upon Dismas' exhibits showing the Project design and layout, we conclude that the Project's design provides adequate emergency vehicle access.

### IV. Landscaping, Screening, Setbacks, and Site Grading/Stormwater

Appellants' SP Appeal Question 5 asks whether the Project complies with Regulations § 260-45.C(3) by providing adequate landscaping, screening and setbacks. Regulations § 260-45.C(3) states that the Commission, or on appeal this Court, shall consider and may impose conditions in relation to the following:

> Adequacy of landscaping, screening, and setbacks in achieving maximum compatibility with and protection of adjacent properties by screening from them any glare produced by interior or exterior lights and unsightly areas such as storage areas, and parking lots; assurance that landscape materials will not interfere with visibility or safety and that they are of a type that can survive and be maintained as proposed.

The site plan as originally designed and proposed to the Town included an on-site parking space close to the driveway's intersection with Maple Street. In accordance with the Town's approval with conditions, Dismas and Twin Pine's current Project proposal relocates this parking space toward the rear, or north, end of the lot. The area of the eliminated parking space will be grass and include a row of 12 arborvitae. This area will serve as a buffer to the eastern bordering apartment building.

The Janisses have privacy concerns. The Janisses' adjoining apartment building is only 18 to 24 inches from the property boundary it shares with the Project site. They believe there is not enough screening proposed to provide adequate privacy and they request additional screening. Dismas testified to its willingness to increase the number of arborvitae and extend

18

the screening along the Project site's eastern boundary that is shared with 1661 and 1615 Maple Street. We conclude that the Project complies with Regulations § 260-45.C(3) with the added condition that Dismas supplement its screening plan to include arborvitae plantings along the entire length of the Project site's eastern common boundary with 1661 and 1615 Maple Street. These plantings shall screen the Project's interior or exterior lights and the parking lot.

Appellants' SP Appeal Question 2 asks whether the Project complies with Regulations § 260-45.B with respect to stormwater drainage, site grading, and landscaping. Regulations § 260-45.B(3)(e) allows the Commission, or this Court on appeal, to require a "[s]tormwater drainage plan, including site grading, prepared by a licensed engineer." It does not, however, impose specific requirements regarding stormwater drainage, site grading, or landscaping. Dismas' Exhibit L illustrates the proposed grading for the Project. Furthermore, Dismas' Exhibit A provides stormwater calculations for 2 and 100 year storm events and drainage and grading detail and calculations from Charles J. Bacan, PE with Millbrook Design, LLC. We therefore conclude that Dismas and Twin Pines' application conforms with Regulations § 260-45.B(3)(e).

## V.   Level of Use

Appellants' SP Appeal Question 6 asks whether the Project complies with Regulations § 260-45 in that the level of use and number of users has been understated. Dismas and Twin Pines' Project involves the House being configured as a single-family home with 9 bedrooms and 2 small offices. The Project proposes that the House will be occupied by 10 people: 8 residents having single bedrooms and 2 students sharing the final, large bedroom. There will also be 2 trained adult staff on-site during the day. A cook will prepare meals and eat with residents.

Appellants entered into evidence draft architectural plans for the interior of the proposed renovated House to contradict Dismas and Twin Pines' testimony as to the level of use for the Project. Although the parties provided conflicting evidence regarding the architectural drawings of the dining room configuration and possible table and chair setup, Dismas offered credible evidence that the Project architect was instructed by Dismas to produce drawings providing dining space for 8 residents, 2 college students, and 2 staff and occasional visitors. This instruction resulted in a design for 1 dining table with 6 chairs.

19

We do not find that Dismas has understated the level of use or the number of users of the Project.

## Conclusion

For the reasons detailed above, we conclude that the Project proposed by Dismas of Vermont, Inc. and Twin Pines Housing Trust for the building at 1673 Maple Street in Hartford Village, Vermont meets the Regulation's requirements for conditional use approval within § 260-58 and site development plan approval within § 260-45.  We condition our approval on two requirements: that Dismas of Vermont, Inc. and Twin Pines Housing Trust (1) ensure that there is street lighting on the south side of Maple Street in the area of the municipal lot and (2) supplement the screening plan to include arborvitae plantings along the entire length of the Project site's eastern common boundary with 1661 and 1615 Maple Street to screen the Project's interior or exterior lights and the parking lot.

This matter is remanded to the Town of Hartford Administrative Officer to complete the ministerial act of issuing a zoning permit pursuant to Regulation § 260-4.

Done at Berlin, Vermont this 20th day of September, 2012.


Thomas G. Walsh,
Environmental Judge